57 CCPA

### Application of Janis ROBINS.
### Patent Appeal No. 8313.

United States Court of Customs and Patent Appeals.

Aug. 13, 1970.

---

Donald M. Sell, St. Paul, Minn. (Kinney, Alexander, Sell, Steldt & DeLaHunt), St. Paul, Minn., attorney of record for appellant; John H. Lewis, Jr., John F. Witherspoon (Stevens, Davis, Miller & Mosher), Arlington, Va., of counsel.

S. Wm. Cochran, Washington, D. C., for the Commissioner of Patents, R. E. Martin, Washington, D. C., of counsel.

Before WORLEY, Chief Judge, and RICH, BALDWIN and LANE, Judges, and RICHARDSON, Judge, United States Customs Court, sitting by designation.

RICH, Judge.

This appeal is from the decision of the Patent Office Board of Appeals [1] affirming the rejection of claims 19–28 of application serial No. 199,644, filed June 4, 1962, entitled "Urethane Elastomers."

The claims on appeal are directed to a process for producing solid, non-cellular urethane polymers and to the resulting product. Appellant has discovered that "ionizable, halogen-free monoorgano mercuric compounds" are especially useful for catalyzing reactions between compounds having at last one reactive iso-

---

[1]. Consisting of Federico and Mangan, Examiners-in-Chief, and Rebold, Acting Examiner-in-Chief, opinion by Mangan.

cyanate group (—NCO) and compounds having at least one reactive hydroxyl group (—OH) to produce a solid, noncellular polyurethane product. Appellant's contribution resides entirely in the catalyst used, the process being otherwise old. Referring to the catalysts useful in his process, appellant's brief states:

> This class of compounds may for convenience be characterized by the formula
>
> RHgX
>
> wherein R is an organo radical such as an alkyl or an aryl group *joined directly to the mercury by a carbon-to-mercury bond,* and X represents an organic or inorganic moiety *joined to the mercury by some other bond than carbon * * *,* e. g., oxygen in the case of a hydroxyl or acid moiety, nitrogen in the case of the ammonium salts, etc. *By definition in the specification, compounds which are monoorgano-mercuric have "only one carbon-to-mercury bond" * * *.* [Emphasis ours.]

Appellant's brief also explains some of the advantages of the claimed process as follows:

> Appellant's invention is that certain classes of mercuric compounds selectively catalyze the secondary hydroxyl-isocyanate (OH–NCO) reaction, and promote it apparently to the substantial exclusion of the water-isocyanate (H₂O–NCO) reaction when small amounts of H₂O are present in the same reactive system with reactive OH groups * * *. Since these classes of mercuric compounds show no such selectivity when studying their effects in NCO–H₂O or NCO–OH reactive systems separately * * *, this selectivity could not be predicted. This discovery is of far reaching commercial importance since it results in the ability to mix monomeric organic polyisocyanates and organic polymeric polyols with one another to provide normally liquid systems for the direct

conversion into polymeric elastomers having predictable cure times and reproducible final properties even in the presence of considerable moisture * * *. This was not possible before because other prior known catalytic soluble compounds of metals were either found to indiscriminately promote the water-isocyanate reaction as well as the hydroxyl-isocyanate reaction or to be inhibited by water * *.

While the N̈CO–H₂O and NCO–OH reaction competition is encouraged in the formation of polyurethane *foams* as the carbon dioxide released in the reaction, $NCO + H_2O \ggg\rightarrow NHCONH + CO_2$, constitutes the foaming agent, such competition is an anathema to the formation of *non-cellular* solid polyurethane rubbers or elastomers. In the latter instance the $NCO + OH \ggg\rightarrow NHCOO$ reaction is required to the exclusion of the NCO–H₂O reaction since the presence of gaseous reaction products causes bubbling or otherwise results in rubbers or elastomers having inferior physical properties * *. [Emphasis ours.]

Claims 19–26 are directed to the above-described process and claims 27 and 28 to the products of the processes of claims 23 and 25, respectively. Claims 19–21 and 27 are representative:

> 19. A process for accelerating the urethane linkage forming reaction between isocyanate and hydroxyl groups in the formation of a urethane product, said process comprising reacting an organic compound having at least one reactive isocyanate group with an organic compound having at least one reactive hydroxyl group in the presence of a catalytic amount of an ionizable, halogen-free, monoorgano mercuric compound having a single carbon to mercury valence bond.
>
> 20. The process of claim 19 wherein said monoorgano mercuric compound is a phenyl mercuric compound.
>
> 21. The process of claim 19 wherein said monoorgano mercuric compound is a phenyl mercuric salt of a carboxylic acid.

27. A product made in accordance with the process of claim 23.

There are two prior art rejections under 35 U.S.C. §§ 102 and 103, and at least one rejection under 35 U.S.C. § 112. The latter rejection, which we consider first, was stated in the examiner's Answer as follows:

*Claims 19–28 stand rejected under 35 U.S.C. 112 on the grounds that same are not supported by the disclosure and are unduly broad.*

*It is the Examiner's position that appellant has not disclosed a suitable number of mercuric compounds falling within the scope of the claims to justify the language in the claims.* Thus, the Examiner is at a loss to figure out what compounds appellant intends to include with the scope of the claims. In the specification, appellang discloses two compounds which are readable on the claims [i. e., on which the claims read]: phenyl mercury acetate and phenyl mercury hydroxide.[2] On page 5 of the specification, appellant discusses in broad terms the catalyst contemplated.[3] Note that appellant states that the "mono-organo" portion of the catalyst may be "alkyl" or "aryl." The only example of "aryl" is phenyl. There are no examples of "alkyl." Note that no particular meaning for "aryl" has been ascribed to in the specification. * * * In this regard, the instant case is similar to *In re Sus* * * * [49 CCPA 1301, 306 F.2d 494, 134 USPQ 301 (1962)]. The board's attention is directed to the discussion at 134 USPQ at 304, column 2 and 305, column 1. Note also that in *In re Sus* several, and not just one example of "aryl" appeared in the specification. * * * The instant specification contains no examples of alkyl. * * * the mono-organo portion of the catalysts is not limited to "aryl" and "alkyl." Thus an [sic, any?] organic radical is included within in appellant's recitations. * * *

The salt portion of the mono-organo mercuric salt has not been given any particular meaning in the specification. * * * Insofar as the recitation "salt of a carboxylic acid" in claim 21 is concerned, appellant has likewise failed to ascribe any particular meaning to the recitation. * * * In short, it is impossible to ascertain with any degree of reliability what compounds appellant intends to include within the meaning of the language presently appearing in the claims. *In re Surrey* * * * [54 CCPA 855, 370 F.2d 349, 151 USPQ 724 (1966).]

* * * * * *

* * * *In view of the fact that appellant has ascribed no particular meaning to the "mono-organo" and "salt" portions of his catalysts, it is submitted that the instant disclosure will not support the broad language of the claims. In re Sus, supra.* [Emphasis ours.]

The board affirmed the examiner, stating in part:

The term "mono-organo" is indefinite, since it obviously is intended to include the "phenyl mercuric salt of a carboxylic acid" (claim 21), which has two organic groups, phenyl and carboxyl.[4]

Our review of the arguments presented leads us to agreement with the Examiner's conclusion that the claims fail to comply with 35 U.S.C. 112. The term "mono-organo" is indefinite for the reason we have given above. Fur-

---

2. As observed by the board, a third specific compound, phenyl mercury octoate, is also disclosed and encompassed by the claims.

3. The discussion to which the examiner here refers reads as follows:
   Among this group [ionizable, halogen-free monoorgano mercuric compounds] are organo-mercuric acetate, borate, benzoate, methacrylate, hydroxide, phthalate, gluconate, salicylate, octoate, stearate, etc.; the organo substituent may be an open or closed claim organic radical which is inert to isocyanate-active hydrogen reactions, as for example an aryl or alkyl group.

4. This is unquestionably a criticism never raised by the examiner.

thermore, we consider the term "organo" to be far broader than is warranted by the compounds disclosed, even including those rather generally given in the paragraph at the top of page 5 of the specification. The field of organic chemistry is too immense and catalytic action too unpredictable to extrapolate phenyl even to aryl, much less to alkyl and then "organo." Precedent, in the form of such decisions particularly as *In re* Surrey [supra] * * * and *In re* Oppenauer, 31 CCPA 1248 * * * 143 F.2d 974, 62 USPQ 297 [(1944)], cited therein, are believed clear to this effect.

■ We find the examiner's Answer to be singularly unclear as to the particular requirement or requirements of § 112 which were thought not to have been met.[5] The first, second and last sentences we have quoted from the examiner's Answer (see our emphasis) suggest that the *specification* was thought to be deficient (§ 112, first paragraph [6]) in some unstated respect. From the remainder of the examiner's remarks, however, it appears that he could not ascertain "what compounds appellant intends to include within the scope of the claims," which amounts to a contention that the *claims* are indefinite (§ 112, second paragraph [7]). The board contributes to our uncertainty by first "agreeing" with the examiner that "the *claims* fail to comply with 35 U.S.C. 112" (second paragraph?—emphasis ours) and then purportedly supporting this conclusion with observations about the immensity of the field of organic chemistry and the unpredictability of catalytic action (§ 112,

first paragraph?—§ 101?). From the board's second decision responding to a Request for Reconsideration, it is apparent that a § 101 rejection was not intended. There the board stated with respect to appellant's acknowledgment that "some chemist might find an inoperable organo-substituent":

> Neither the Examiner's holding nor our decision was on this basis, but rather they were based on the *lack of reasonable support* for the immense breadth of the claim terminology. [Emphasis ours.]

If the examiner and/or the board intended a rejection under the first paragraph of § 112, it must be reversed inasmuch as the specification contains a statement of appellant's invention which is as broad as appellant's broadest claims, and inasmuch as the sufficiency of the specification to satisfy the "best mode" requirement of § 112 and to enable one skilled in the art to practice appellant's process as broadly as it is claimed has not been questioned.

■ Both the examiner and the board seem to have taken the position that in order to "justify," as the examiner said, or to "support," as the board said, broad generic language in a claim, the specification must be equally broad in its naming, and use in examples, of representative compounds encompassed by the claim language. This position, however, misapprehends the proper function of such disclosure. Mention of representative compounds encompassed by generic claim language clearly is not required by § 112 or any other provision of the statute. But, where no explicit de-

---

5. Our consideration of this appeal would have been immeasurably simplified had the examiner merely referred to specific language in § 112, or at least to the paragraph in which it is to be found. Perhaps more so with respect to § 112 than with any other section of the statute, it is essential for the orderly resolution of issues that the specific requirement on which the rejection is based be clearly identified.

6. Which reads in pertinent part:
   The specification shall contain a written description of the invention, and of the

manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same * * *.

7. Which reads in pertinent part:
   The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which applicant regards as his invention.

scription of a generic invention is to be found in the specification (which is not the case here) mention of representative compounds may provide an implicit description upon which to base generic claim language. See *In re Sus,* supra, cited by the examiner and discussed below. Similarly, representative examples are not required by the statute and are not an end in themselves. Rather, they are a *means* by which certain requirements of the statute may be satisfied. Thus, inclusion of a number of representative examples in a specification is *one* way of demonstrating the operability of a broad chemical invention and hence, establishing that the utility requirement of § 101 has been met. It also is *one* way of teaching how to make and/or how to use the claimed invention, thus satisfying that aspect of § 112. However, there has here been no contention by the Patent Office that any of these requirements has not been met. We therefore fail to attach any significance to the absence of representative examples.

In fairness to the examiner and the board, it is not difficult to see how they might have been led by the *Sus, Surrey,* and *Oppenauer* cases, which they cited, to take the position which they appear to have taken. These cases, however, are readily distinguishable from the present case.

In *Sus,* appellant used the terms "aryl and substituted aryl radicals" or "substituted and unsubstituted aryl radicals" in his claims. However, we found nothing in the way of express statements *or examples* in the specification that would teach one skilled in the art that "all 'aryl and substituted aryl radicals' were properly within the subject matter which appellants considered to be their invention." Accordingly we held that the claims were broader than the disclosure.[8] (In this regard see note 4 of the opinion.) In

the present case, there are express statements of appellant's invention which are as broad as his claims, and *Sus* therefore is not in point.

■ In *Surrey,* where the issues were (1) sufficiency of the disclosure to teach "how to use" the claimed compounds (§ 112, first paragraph) and (2) sufficiency of the *proof* that the compounds were in fact useful (§ 101), we stated:

> [A]ppellant here has failed to provide those of ordinary skill in the art, the Patent Office and this court, reasonable assurance, *as by adequate representative examples,* that the compounds falling within the scope of the claim will possess the asserted usefulness. [Emphasis ours.]

Since § 112 does not require that a specification *convince* persons skilled in the art that the assertions therein are correct and since the above statement says *"as by adequate representative examples"* (emphasis ours), it *cannot* be reasonably inferred from *Surrey,* that the mentioned assurance *must* be provided by examples in the specification as opposed, for example, to affidavits as provided for by Rule 132. Since neither of the issues in *Surrey* is raised here, this case also is not in point.

In *Oppenauer,* somewhat as in *Sus,* several materials were recited more broadly in the claims than they were disclosed in the specification. As in *Surrey,* the sufficiency of the "how to use" disclosure of the specification was questioned and the court held that the specification did not contain a teaching that all of the materials of one type recited in the claims as being indefinite (§ 112, ing the desired result." We do not have a comparable situation here.

■■ We turn now to the possibility that the examiner intended a rejection of the claims as being indefinite (§ 112, second paragraph). The examiner points

---

8. In *Sus,* the rejection was based on the second paragraph of § 112. For the reasons given in In re Halleck, 422 F.2d 911, 57 CCPA (1970); In re Borkowski, 422 F.2d 904, 57 CCPA 946 (1970); and In re Wakefield, 422 F.2d 897, 57 CCPA 959 (1970), such rejections are more properly considered under the first paragraph of that section.

out that appellant does not ascribe any *special* meaning to terms such as "organo" and "salt of carboxylic acid" and to the "salt" portion of his catalyst. From this he concludes that

> it is impossible to ascertain with any degree of reliability what compounds appellant intends to include within the meaning of the language presently appearing in the claims.

The examiner, however, was able to state, "Thus an [sic, any?] organic radical is included within appellant's recitations." He also cited four foreign patents [9] to show various radicals which he apparently considered to be rather exotic and which the terms used in the claims would encompass in the absence of special meanings. This ability of the examiner to enumerate radicals encompassed by the claim language points up, we think, the weakness of the indefiniteness argument. Giving the language its broadest possible meaning, as we are bound to do in the absence of special definitions by appellant, the breadth of the claims insofar as the catalyst is concerned is indeed immense. However, "Breadth is not indefiniteness." In re Gardner, 427 F.2d 786, 57 CCPA (1970).

Apparently interpreting the "monoorgano" as limiting the number of organic radicals possible in appellant's catalyst to one, the board held this expression to be indefinite because

> it obviously is intended to include the "phenyl mercuric salt of a carboxylic acid" (claim 21), which has two organic groups, phenyl and carboxyl.

Appellant's specification, however, makes it perfectly clear that it is the number of *carbon-to-mercury* bonds, rather than the number of *organo groups,* that is restricted to one by the "mono" in the expression "monoorgano mercuric compound." Thus the specification states:

> Presently preferred divalent mercury containing compounds are the * * * ionizable monoorgano-mercuric compounds (*which contain only one carbon-to-mercury bond*). [Emphasis ours.]

The sense in which appellant uses the expression "monoorgano mercuric compound" is also consistent with the following definition from Hackh's Chemical Dictionary (3rd ed.), cited by both appellant and the solicitor:

> *organometallic. Pertaining to the carbon-metal linkage. o. compounds.* A class of compounds of the type R-M, where R is an alkyl or aryl radical and M is a metal; e.g., PbEt₄, tetraethyl lead; R-Mg-X, alkyl-magnesium-halide. [Emphasis ours.]

In its second opinion, the board noted that appellant's use of the phrase "having a single carbon to mercury valence bond" in some of the claims to qualify the expression "monoorgano mercuric compound" creates somewhat of a redundancy since in the specification the former expression is used to define the latter. We find, however, that rather than rendering the claims indefinite, this redundancy merely removes any question as to the meaning of the latter expression We therefore cannot agree with the board's reasons for holding appellant's claims indefinite.

There remains for our considerations two prior art rejections. The references relied on are:

| | | |
|---|---|---|
| Windemuth et al. | 3,073,702 | Jan. 15, 1963 |
| | | (filed Oct. 22, 1959) |
| Kaestner et al. | 3,136,732 | June 9, 1964 |
| | | (filed Oct. 7, 1960) |

Journal of Applied Polymer Science, Vol. IV, No. 11, pp. 207–11 (1960)

9. Australian, 160,814, Jan.1955; Australian, 208,961, June 1957; British, 692,-953, June 1953; and Canadian, 706,906, Mar. 1965.

The examiner rejected all the claims under 35 U.S.C. § 103 as "unpatentable over the combination of Kaestner * * * and Journal of Applied Polymer Science" (hereinafter "JAPS"), and claims 27 and 28 under 35 U.S.C. § 102 as "fully met by Windemuth."

Windemuth et al. ("Windemuth") relates to the production of polyurethane products from isocyanates and polyethers using catalysts which differ from those used by appellant. Windemuth discloses that the best results are obtained from divalent or tetravalent tin compounds, e.g., stannic chloride and dibutyl tin dilaurate.

Kaestner et al. ("Kaestner") discloses a process of making polyurethanes in which the catalyst is a metal naphthenate. Mercury naphthenate is disclosed as being preferred.[10]

The JAPS article reports the results of a study in which the catalytic activities of a wide variety of metallic compounds for isocyanate-hydroxyl reactions were determined. The article states:

A list of the type compounds in a roughly *descending* order of catalytic activity is Bi, Pb, Sn, triethylenediamine, strong bases, Ti, Fe, Sb, U, Cd, Co, Th, Al, *Hg*, Zn, Ni, trialkylamines, Ce, Mo, V, Cu, Mn, Zr, and trialkyl phosphines. [Emphasis ours.]

Diphenyl mercury appears to have been the only mercury compound tested.

The examiner explained the rejection of all the claims on Kaestner and JABS as follows:

The claims in the instant application are directed to the use of a mono-organo mercury compound having a single carbon-mercury bond as catalysts for the preparation of polyurethanes. Included within the scope of appellant's mercury compounds is phenyl mercury naphthenate. The

structural formula of phenyl mercury naphthenate is:

[A2454]

Kaestner et al. disclose the use of mercury naphthenate as a catalyst for the preparation of polyurethanes. * * * Mercury naphthenate has the following structural formula:

[A2455]

JAPS discloses the use of diphenylmercury as a catalyst for the preparation of polyurethanes. * * * The structural formula of diphenylmercury is:

[A2456]

Phenyl mercury salts of carboxylic acids are known in the art. * * * Appellant does not challenge this position.

The Board is invited to compare the structural formulae of the prior art catalysts and appellant's catalyst. Moreover, the Board will note that the

---

10. Appellant challenges the availability of Kaestner on the basis of a parent application filing date. The Patent Office denies his right to rely on the parent. We find it unnecessary to consider this issue since we find the rejection based on this reference to be unsound on other grounds.

utility (properties) of the mercury compounds is identical.

In view of the facts (1) that mercury naphthenate is a known catalyst for producing polyurethanes, as taught by Kaestner et al; (2) that diphenyl-mercury is a known catalyst for producing polyurethanes, as taught by JAPS; and (3) that appellant's organo-mercury-salts are known compounds; it is the Examiner's position that one skilled would find it obvious to use phenyl mercury naphthenate as a catalyst for producing polyurethanes.

From the foregoing it will be seen that the mercury naphthenate of Kaestner contains an -O-Hg-O- linkage, the diphenyl mercury catalyst of JAPS a -C-Hg-C- linkage, and appellant's compounds a -C-Hg-X- linkage, where "X" typically may be oxygen as in phenyl mercury naphthenate.

■ Appellant argues that his mono-organo-mercuric compounds (R-Hg-X) are of a different class than the diorgano-mercuric compounds (R-Hg-R) represented by the diphenyl mercury of JAPS and the mercuric salts of carboxylic acids

$$R-\overset{\overset{\displaystyle O}{\|}}{C}-O-Hg-O-\overset{\overset{\displaystyle O}{\|}}{C}-R$$

(R-C-O-Hg-O-C-R) represented by the mercuric napthenate of Kaestner. Appellant also points out differences in the catalytic action of the three classes of compounds. Specifically he notes that JAPS shows lead octoate (which JAPS reports as being one of the most active catalysts tested) to be 40 times more active than diphenyl mercury as a catalyst for isocyanate-hydroxyl reactions, while appellant's specification establishes lead octoate to be about comparable to his monoorgano-mercuric compounds under anhydrous conditions but much worse in the presence of even 0.1% of moisture. Comparing his mono-organo mercuric compounds with the mercuric salts of carboxylic acids, such as the mercuric

naphthenate disclosed in Kaestner, appellant urges that the former are "more potent catalysts" and possess "the further unexpected advantage, in the casting of one-shot rubbers, of enabling the liquid and pourable mixture which cures to the rubber to stay liquid and pourable for a long period of time while still not increasing the total gelation time * * *." Although we do not find the latter advantage to be substantiated in the record, comparative examples in appellant's specification do support the conclusion that the monoorgano mercuric compounds are the more potent catalysts. Having considered all the arguments and evidence of record and the board's observation about the unpredictability of catalytic action, we conclude that the rejection based on Kaestner and JAPS must be reversed.

■ We affirm, however, the rejection of product-by-process claims 27 and 28 under 35 U.S.C. § 102 on Windemuth which discloses the production of polyurethanes using various tin compounds as catalysts. The examiner took the position that the claimed products and certain of the polyurethane products of Windemuth would not differ materially. Appellant submitted a Rule 132 affidavit containing comparisons of the physical properties of polyurethanes produced using stannic chloride, dibutyl tin chloride, and phenyl mercuric acetate, the first two being disclosed in Windemuth and the last being one of appellant's catalysts. The examiner criticized the affidavit because of appellant's choice of tin compounds disclosed in the reference. He felt that a tin compound containing both salt groups and carbon-metal groups, such as dibutyl tin dilaurate disclosed in Windemuth, would have been more similar in structure to appellant's catalysts and therefore should have been used in the comparison.[11] Appellant attempts to defend his choice by pointing out that the reference discloses stannic chloride

---

11. Dibutyl tin dilaurate was compared with phenyl mercuric acetate in one example of appellant's specification, but the example is concerned only with the effect of water on catalytic activity and no details are given as to the properties of the products.

as being a preferred catalyst. However, in considering this rejection, we are not concerned with superiority of the catalysts but rather with differences, if any, in the products produced. We agree with the examiner that to be persuasive the affidavit should have included in the comparison a product obtained using a catalyst more similar in structure to appellant's catalysts.

In summary, we reverse the rejections under § 112 and § 103 and affirm the rejection under § 102.

Accordingly, the decision of the board is reversed as to claims 19–26 and affirmed as to claims 27 and 28.

MODIFIED

WORLEY, C. J., took no part in the decision of this case.