NOTE:  This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

2007-1197

ENERGIZER HOLDINGS, INC.
and  EVEREADY BATTERY COMPANY, INC.,

Appellants,

v.

INTERNATIONAL TRADE COMMISSION,

Appellee.

and

GOLDEN POWER INDUSTRIES, LTD., GUANGDONG CHAOAN ZHENGLONG ENTERPRISE CO., LTD., GUANGZHOU TIGER HEAD BATTERY GROUP CO., LTD., FUJIAN NANPING NANFU BATTERY CO., LTD., HI-WATT BATTERY INDUSTRY CO., LTD., NINGBO BAOWANG BATTERY CO., LTD., SICHUAN CHANGHONG ELECTRIC CO., LTD., and ZHONGYIN (NINGBO) BATTERY CO., LTD.,

Intervenors.

Randall G. Litton, Price, Heneveld, Cooper, DeWitt & Litton, LLP, of Grand Rapids, Michigan, argued for appellant.  With him on the brief were Eugene J. Rath III and Matthew J. Gipson.  Of counsel on the brief was V. James Adduci, II, Adduci, Mastriani & Schaumberg, L.L.P., of Washington, DC.  Of counsel was Michael L. Doane.

Wayne W. Herrington, Assistant General Counsel, Office of the General Counsel, United States International Trade Commission, of Washington, DC, argued for appellee. With him on the brief was James M. Lyons, General Counsel.

Steven P. Hollman, Hogan & Hartson, L.L.P., of Washington, DC, argued for intervenors, Golden Power Industries, Ltd., et al.  With him on the brief were Susan Cook, Jessica L. Ellsworth, and Dana Carver Boehm.  Of counsel on the brief were William E. Thomson, Jr., Wei-Ning Yang, and Yoncha L. Kundupoglu, of Los Angeles, California.  Of counsel was Robert B. Wolinsky, of Washington, D.C.

Appealed from: United States International Trade Commission

NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

2007-1197

ENERGIZER HOLDINGS, INC.
and EVEREADY BATTERY COMPANY, INC.,

Appellants,

v.

INTERNATIONAL TRADE COMMISSION,

Appellee,

and

GOLDEN POWER INDUSTRIES, LTD., GUANGDONG CHAOAN ZHENGLONG ENTERPRISE CO., LTD., GUANGZHOU TIGER HEAD BATTERY GROUP CO., LTD., FUJIAN NANPING NAFU BATTERY CO., LTD., HI-WATT BATTERY INDUSTRY CO., LTD., NINGBO BAOWANG BATTERY CO., LTD., SICHUAN CHANGHONG ELECTRIC CO., LTD., and ZHONGYIN (NINGBO) BATTERY CO., LTD.,

Intervenors.

On appeal from the United States International Trade Commission in Investigation No. 337-TA-493.

_____

DECIDED: April 21, 2008

_____

Before NEWMAN, SCHALL, and LINN, <u>Circuit Judges</u>.

SCHALL, <u>Circuit Judge</u>.<sup>*</sup>

_____

    <sup>*</sup> The judgment of the International Trade Commission is affirmed in separate opinions by Judge Schall and Judge Linn. Judge Newman files a dissenting opinion.

Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337 (2000), prohibits "[t]he importation into the United States, the sale for importation, or the sale within the United States after importation of articles . . . that infringe a valid and enforceable United States patent," id. § 1337(a)(1)(B). On April 28, 2003, Energizer Holdings, Inc. and Eveready Battery Company, Inc. (collectively "Energizer") filed a complaint with the International Trade Commission ("Commission") alleging violations of section 337 as a result of the importation into the United States, the sale for importation, and the sale within the United States after importation, of certain zero-mercury-added alkaline batteries by fourteen Chinese battery manufacturers.[1] According to Energizer, the actions of the battery manufacturers constituted infringement of claims 1–12 of U.S. Patent No. 5,464,709 (the "'709 patent").[2] In response to the complaint, the Commission instituted a section 337 investigation. 68 Fed. Reg. 32771 (June 2, 2003). During the course of the investigation, Energizer disclaimed claims 8–12, leaving only claims 1–7 of the '709 patent at issue.

On October 1, 2004, the Commission issued a notice stating that it was terminating its investigation with a finding of no violation of section 337, the reason being that the Commission had determined that the asserted claims of the '709 patent were invalid for failure to meet the definiteness requirement of 35 U.S.C. § 112, ¶ 2 ("The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."). The Commission issued a decision explaining its determination on October 18, 2004. In

---

[1] Several of those manufacturers ("Intervenors") have intervened in this case.

[2] The '709 patent is owned by Eveready Battery Company, Inc., a subsidiary of Energizer Holdings, Inc.

re Certain Zero-Mercury-Added Alkaline Batteries, Parts Thereof, and Products Containing Same, Inv. No. 337-TA-493 (Int'l Trade Comm'n Oct. 18, 2004) ("Energizer I"). Energizer appealed the Commission's ruling in Energizer I to this court. Subsequently, in Energizer Holdings, Inc. v. International Trade Commission, 435 F.3d 1366 (Fed. Cir. 2006) ("Energizer II"), this court reversed the decision of the Commission that claims 1–7 of the '709 patent were indefinite and remanded the case to the Commission for further proceedings, id. at 1371. On remand, the Commission determined (i) that claims 1–7 of the '709 patent are invalid for failure to meet the written description requirement of 35 U.S.C. § 112, ¶ 1 ("The specification shall contain a written description of the invention, and the manner and process of making it . . . .") and (ii) that, if valid, the claims are not infringed by the accused imported products. In re Certain Zero-Mercury-Added Alkaline Batteries, Parts Thereof, and Products Containing Same, No. 337-TA-493 (Int'l Trade Comm'n Feb. 23, 2007) ("Energizer III"). Energizer now appeals. Because I agree with the Commission that the asserted claims of the '709 patent are invalid for failure to meet the written description requirement of § 112, ¶ 1, I would affirm the Commission's decision in Energizer III. Deciding the case on this ground, I do not reach the issue of infringement.

BACKGROUND

I.

Commercial batteries consist of three primary components: a cathode, an anode, and an electrical conductor connecting the cathode to the anode. A battery cathode contains a reducing agent, an element or compound that releases electrons in a chemical reaction. A battery anode contains an oxidizing agent, an element or

compound that receives electrons released by the cathode in a chemical reaction. When an electrical conductor connects the cathode to the anode, electrons flow through the conductor, creating an electrical current that can power electronic devices.

Commercial alkaline batteries traditionally have contained manganese dioxide as an active cathode component and zinc as an active anode component. The usage of zinc as an anode component tends to result in the corrosion of the zinc and the production of hydrogen gas, leading to battery leakage. Energizer II, 435 F.3d at 1368. To remedy this problem, battery manufacturers adopted the practice of amalgamating mercury with the zinc in the anode of the battery, which tends to inhibit corrosion and thereby limit hydrogen gas formation. Id. The disposal of mercury-containing batteries, however, presents an environmental hazard. As a result, research scientists have sought to limit the amount of mercury contained in commercial alkaline batteries. Id.

The '709 patent issued following the discovery of a test for screening zinc metal in order to find zinc substantially free of the impurities that cause corrosion. Id. Using such zinc in commercial batteries lessens the need for mercury as an additive. Claim 1, which the parties agree claims a commercial battery, states:

> An electrochemical cell comprising an alkaline electrolyte, a cathode comprising manganese dioxide as an active cathode component, and an anode gel comprised of zinc as the active anode component, wherein the cell contains less than 50 parts of mercury per million parts by weight of the cell and said zinc anode has a gel expansion of less than 25% after being discharged for 161 minutes to 15% depth of discharge at 2.88A.

II.

As noted, in response to a complaint by Energizer, the Commission initiated an investigation of various battery manufacturers who imported batteries that allegedly infringed the '709 patent, in violation of section 337 of the Tariff Act of 1930. Energizer I

at 1. On June 2, 2004, the Administrative Law Judge ("ALJ") assigned to the case issued a final determination that the battery manufacturers had imported batteries in violation of section 337. Id. at 3. The manufacturers appealed this final determination. Id. at 4.

On appeal, the Commission reversed the decision of the ALJ, issuing a final determination that the manufacturers did not violate section 337, inasmuch as claims 1–7 of the '709 patent were invalid by reason of indefiniteness. Id. at 22. In making this determination, the Commission focused upon claim 1, quoted above. Id. at 22–27. The Commission ruled that claim 1 was indefinite because the term "said zinc anode" did not have a definitive antecedent basis. Id. at 25–26. The Commission reasoned that, if "anode gel" is construed to be the antecedent basis of "said zinc anode," the claim becomes nonsensical because only the test cell wherein zinc is screened for use in a battery, not the anode gel of an actual completed battery, is subjected to the discharge process described in claim 1. Id. at 25. Alternatively, if "said zinc anode" is interpreted to refer to the zinc that is tested for integration into a battery, then the word "anode" in "said zinc anode" becomes superfluous. Id. at 25–26. Since, in the Commission's view, neither potential antecedent basis of "said zinc anode" resulted in a comprehensible claim, the Commission ruled claim 1, and claims 2–7 which depend from it, indefinite. Id. at 26. Consequently, the Commission terminated its investigation with a finding of no violation of section 337. Id. at 22. Energizer appealed the decision of the Commission in Energizer I to this court.

III.

As noted, the definiteness requirement is set forth in 35 U.S.C. § 112, ¶ 2. To comply with § 112, ¶ 2, a claim must "particularly point[] out and distinctly claim[] the subject matter which the applicant regards as his invention." This court has stated that "[c]laims are considered indefinite when they are 'not amenable to construction or are insolubly ambiguous . . . . Thus, the definiteness of claim terms depends on whether those terms can be given any reasonable meaning.'" Young v. Lumenis, Inc., 492 F.3d 1336, 1346 (Fed. Cir. 2007) (quoting Datamize, LLC v. Plumtree Software, Inc., 417 F.3d 1342, 1347 (Fed. Cir. 2005)). In other words, an indefiniteness inquiry "requires a determination whether those skilled in the art would understand what is claimed." Id.

In Energizer II, this court held that claim 1 of the '709 patent was not invalid by reason of indefiniteness. 435 F.3d at 1371. After noting that "[a] claim that is amenable to construction is not invalid on the ground of indefinitness," the court stated:

> Here, it is apparent that the claim can be construed. In that regard, we conclude that "anode gel" is by implication the antecedent basis for "said zinc anode." The Commission's holding of invalidity on the ground of indefiniteness is reversed.

Id. Having reversed the Commission's decision, the court remanded the case to the Commission for further proceedings. Id.

IV.

Applying what it viewed as "the claim construction mandated by the Federal Circuit," the Commission concluded that "claim 1 is invalid because the specification does not 'contain a written description of the invention . . .' as required by 35 U.S.C. § 112 ¶ 1." Energizer III at 13. The Commission came to this conclusion via a two-step process. First, it considered claim 1 itself. Starting from the premise that the "anode

gel" of the claim was "the anode of the completed electrochemical cell destined for consumers," the Commission stated that "[t]he claim language 'after being discharged . . .' specifically calls for the discharge of that anode (and only that anode) in the specified manner. No other anode is recited in the claims." Id. The Commission emphasized that "[n]either the test cell [of the specification] nor its anode are [sic] recited in the claims" and that there is no language in the claims that "establishes any relationship between the anode of the electrochemical cell and the (different) anode of the test cell, the only cell which the specification describes as being discharged in accordance with the claim language." Id. at 14 (footnote omitted). The Commission recognized that "calling for the anode of the electrochemical cell to be discharged in accordance with the parameters set out in the claims may be illogical."[3] Id. It stated, however: "[T]his is what is called for by the claims and we are not permitted to redraft those claims to supply different or missing language or to provide language to supply any missing connection between the claimed anode gel of the electrochemical cell and the unclaimed anode gel of the test cell." Id.

Turning next to the specification of the '709 patent, the Commission pointed out that "[i]n contrast to the claims, the specification does not describe the anode of the electrochemical cell as being discharged in accordance with the claim language. Rather, it only describes the anode gel (anode) of the test cell as being so discharged." Id. In that regard, the Commission noted that "the specification associates the language

---

[3] Subjecting an anode of a completed battery to such a discharge would be illogical because "according to Faraday's Law, an anode (anode gel) with zinc as the active anode component which is 'discharged' for '161 minutes to 15% depth of discharge at 2.88 A', as stated in claim 1, would have to contain 63 grams of zinc." Energizer III at 15 n.10. No commercially available battery contains anywhere near that quantity of zinc.

'discharged for 161 minutes to 15% depth of discharge at 2.88A' only with the measurement or test cell, which is not referred to in the claim. The specification does not associate the discharge language with the 'electrochemical cell' of the claims or with the anode gel (anode) of that cell." Id. (internal citation omitted). Based upon its examination of the specification, the Commission concluded that "[t]here is thus no description in the specification of an 'electrochemical cell' destined for consumers that is to be discharged for 161 minutes to 15% depth of discharge at 2.88A and no indication in the specification that the patentee was ever in possession of such a cell." Id. at 14–15.

Based upon its analysis of claim 1 and the specification of the '709 patent, the Commission determined that the asserted claims of the patent were invalid for failure to meet the written description requirement. Id. at 16. The Commission also determined that, assuming claims 1–7 were not invalid, this court's claim construction precluded a finding of infringement because no commercially available battery possesses all of the limitations recited in claim 1 of the '709 patent. Id. at 17. Energizer now appeals the Commission's decision in Energizer III.

DISCUSSION

This court has jurisdiction over a final decision of the Commission pursuant to 19 U.S.C. § 1337(c) and 28 U.S.C. § 1295(a)(6). On appeal, Energizer challenges the decision of the Commission in Energizer III with respect to both validity and infringement. Since I would resolve the appeal on the basis of validity, I do not reach the issue of infringement.

I.

Recognizing that in <u>Energizer III</u> the Commission applied what it viewed as "the claim construction mandated by the Federal Circuit," <u>id.</u> at 13, Energizer takes the position that, in <u>Energizer II</u>, this court did not construe the term "said zinc anode." Starting from this premise, it argues that, "since the prior panel did not directly consider the construction of 'said zinc anode,' only that the lack of an explicit antecedent basis did not render the claim indefinite, the construction of 'said zinc anode' is not covered by the law-of-the-case doctrine." Energizer Reply Br. 16–17.

From there, Energizer argues that the Commission erred in ruling that the asserted claims of the '709 patent are invalid for failure to meet the written description requirement of 35 U.S.C. § 112, ¶ 1. In making this argument, it contends that the Commission's written description analysis is flawed because it is based upon an incorrect claim construction. According to Energizer, "[w]hen the entirety of the claim language, the specification, and other evidence of record is considered, it is the 'zinc'— i.e., the 'active anode component'—which must possess the characteristics necessary to comply with the post-partial discharge requirements of claim 1." Energizer Br. 24. In other words, Energizer argues that, when properly construed, claim 1 "requires that the zinc powder utilized to make the anode gel, not the anode gel itself, possess the expansion properties required by the claims." <u>Id.</u> at 37. When construed this way, Energizer states, claim 1 and its dependent claims are not invalid for failure to meet the written description requirement. That is because "[t]here is no doubt that the written description of the specification makes it clear that it is the anode mix of the test cell, not the anode gel of the claimed electrochemical cell, that is to be discharged in accordance

2007-1197                                        9

with the limitation of claim 1—i.e., 'for 161 minutes to a 15% depth of discharge at 2.88A.'" Id. at 28.

The prior panel in Energizer II did construe the term "said zinc anode." The pertinent part of the opinion is quoted above. For present purposes what is most important are the first two sentences of the quoted material: "Here, it is apparent that the claim can be construed. In that regard, we conclude that 'anode gel' is by implication the antecedent basis for 'said zinc anode.'" Energizer II, 435 F.3d at 1371. This language constitutes a clear statement of claim construction.

As noted above, the issue of whether a claim meets the definiteness requirement of section 112, ¶ 2 turns on a determination as to whether the claim can be construed. Thus, the Energizer II panel appropriately went beyond merely holding that "said zinc anode" was not indefinite for lack of an antecedent basis. Rather, the panel stated that "said zinc anode" possessed an antecedent basis, which antecedent basis was "anode gel." Id.; see Aero Prods. Int'l, Inc. v. Intex Recreation Corp., 466 F.3d 1000, 1016 (Fed. Cir. 2006) (determining that a claim can be construed and subsequently dictating the proper construction); Howmedica Osteonics Corp. v. Tranquil Prospects, Ltd., 401 F.3d 1367, 1371 (Fed. Cir. 2005) (same).

Whenever a panel of an appellate court definitively decides an issue, the issue cannot be reconsidered by a lower court on rehearing the case or by a second panel of the appellate court. See Gould, Inc. v. United States, 67 F.3d 925, 930 (Fed. Cir. 1995) (stating that the rule established by a prior panel must apply in decisions of lower courts and later panels absent the emergence of new evidence, intervening change of law, or clear error in the previous opinion working manifest injustice); Gindes v. United States,

740 F.2d 947, 949 (Fed. Cir. 1984) (noting that the rule adopted in an appeal must be applied by any lower court and a later panel of the appeals court, whether correct or not, absent exceptional circumstances). Thus, as far as claim 1 of the '709 patent is concerned, as a matter of claim construction, "said zinc anode" denotes "anode gel."

Once it is established that, in claim 1, the term "said zinc anode" denotes "anode gel," it becomes clear that Energizer's claim construction argument must be rejected. The reason is that, when boiled down to its essentials, the argument represents a backdoor attempt to overturn the construction that the court set forth in Energizer II. Energizer argues that, in claim 1, "said zinc anode" denotes the zinc used to manufacture the "anode gel" in the battery cell. The problem with that argument is that it squarely contradicts what the court said in Energizer II: "Here it is apparent that the claim can be construed. In that regard, we conclude that 'anode gel' is by implication the antecedent basis for 'said zinc anode.'" 435 F.3d at 1371. Once it is determined that "said zinc anode" denotes "anode gel," it means that, as the Commission held, it is the "anode gel" of the battery cell sold to consumers—not the zinc of the test cell—that is tested in accordance with the parameters of the claim.

As I will discuss in more detail below, a fundamental disconnect exists between the claims and specification of the '709 patent. The specification speaks consistently of a test cell, describing its properties and usage, whereas the claims speak exclusively of the anode of a completed battery. I recognize that claims are to be read in light of the specification, of which they are a part. Phillips v. AWH Corp., 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc). At the same time, however, "[i]t is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is

entitled the right to exclude.'" Id. at 1312 (quoting Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1115 (Fed. Cir. 2004)). "The written description part of the specification itself does not delimit the right to exclude. That is the function and purpose of the claims." Markman v. Westview Instruments, Inc., 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc), aff'd 517 U.S. 370 (1996). A court cannot remedy for Energizer the gulf that it has created between the claims and the specification by speaking solely of a test cell in the specification while claiming a completed battery in the claims.

Energizer's argument that construing "said zinc anode" of claim 1 to denote "anode gel" leads to an illogical result is unavailing. This court addressed a similar contention in Chef America, Inc. v. Lamb-Weston, Inc., 358 F.3d 1371 (Fed. Cir. 2004). In that case, the claim at issue related to a dough-producing process. By its terms, one of the claim limitations called for "'heating the . . . dough to a temperature in the range of about 400º F. to 850º F. for a period of time ranging from about 10 seconds to 5 minutes . . . .'" Id. at 1374. The problem with this limitation was that it was undisputed that, if the dough was heated to the specified temperature range, "it would be burned to a crisp." Id. at 1373. Nevertheless, noting that "the claim unambiguously requires that the dough be heated to a temperature range of 400º F. to 850º F.," the court rejected the patentees' argument that it should construe the word "to" in the claim to mean "at" because otherwise the patented process could not perform the function the patentees intended. Id. at 1374–75. Referring to cases cited earlier in the opinion, the court stated: "As we have noted . . ., we have repeatedly declined to rewrite unambiguous claim language for that reason." Id. at 1375.

Claim 1 of the '709 patent unambiguously requires that the anode gel of a battery sold to consumers undergo the discharge test set forth in the specification. The claim requires that "said zinc anode [i.e. the anode gel of the battery sold to consumers] ha[ve] a gel expansion of less than 25% after being discharged for 161 minutes to 15% depth of discharge at 2.88A." However, as noted above, no commercial battery could be subjected to such a test. Thus, as did the claim in Chef America, claim 1 unambiguously requires an illogical result. The inventor easily could have avoided this problem by drafting claim 1 so that it read "said zinc anode is comprised of zinc that has a gel expansion of less than 25% after being discharged for 161 minutes to 15% depth of discharge at 2.88A." The inventor did not use such language, however. Instead, he wrote a claim that unambiguously calls for subjecting the anode gel of a completed battery to the discharge test, and this court cannot rewrite the claim. I turn now to the issue of validity.

## II.

Patents are presumed valid, and the party challenging a patent as invalid must present clear and convincing evidence of invalidity. 35 U.S.C. § 282 (2000); Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings, 370 F.3d 1354, 1365 (Fed. Cir. 2004). Thus, before the Commission, Intervenors were required to show by clear and convincing evidence that the '709 patent did not comply with the written description requirement of 35 U.S.C. § 112, ¶ 1.

A validly issued patent must comply with the written description requirement. As noted above, 35 U.S.C. § 112, ¶ 1 provides that "[t]he specification shall contain a written description of the invention." In University of Rochester v. G.D. Searle & Co.,

358 F.3d 916 (Fed. Cir. 2004), this court stated that the written description requirement involves "determining whether the subject matter defined in the claims is described in the specification," id. at 921; see also TurboCare Div. of Demag Delaval Turbomachinery Corp. v. Gen. Elec. Co., 264 F.3d 1111, 1119 (Fed. Cir. 2001) (holding that "[n]o reasonable juror could find that [the appellant's] original disclosure was sufficiently detailed to enable one of skill in the art to recognize that [the appellant] invented what is claimed"). In other words, the specification must describe the subject matter of the invention that is later claimed to be protected in the claims. Univ. of Rochester, 358 F.3d at 927.

The determination of whether a patent meets the written description requirement is a question of fact. Falko-Gunter Falkner v. Inglis, 448 F.3d 1357, 1363 (Fed. Cir. 2006). In an appeal of a final decision of the Commission under 19 U.S.C. § 1337, this court reviews the Commission's findings of fact to determine whether they are supported by "substantial evidence." See Jazz Photo Corp. v. Int'l Trade Comm'n, 264 F.3d 1094, 1099 (Fed. Cir. 2001); Tandon Corp. v. Int'l Trade Comm'n, 831 F.2d 1017, 1019 (Fed. Cir. 1987). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Oak Tech., Inc. v. Int'l Trade Comm'n, 248 F.3d 1316, 1325 (Fed. Cir. 2001) (quoting Consol. Edison Co. v. Nat'l Labor Relations Bd., 305 U.S. 197, 217 (1938)).

Claim 1 of the '709 patent claims "[a]n electrochemical cell comprising . . . an anode gel comprised of zinc as the active anode component, wherein . . . said zinc anode has a gel expansion of less than 25% after being discharged for 161 minutes to 15% depth of discharge at 2.88A." '709 patent col.10 ll.57–64. As seen, the

Commission found a major disconnect between the language of the claims and the specification.

The claimed "electrochemical cell" is a battery cell to be sold to consumers. As discussed above, what this means is that, by its plain terms, claim 1 of the '709 patent claims a battery cell to be sold to consumers in which the anode gel (or the anode) of the cell "has a gel expansion of less than 25% after being discharged for 161 minutes to 15% depth of discharge at 2.88A." Id. col.10 ll.62–64. That, however, is not what is disclosed in the specification. Indeed, Energizer recognizes this, for on appeal it states that "[t]here is no doubt in this case that the written description of the specification makes clear that it is the anode mix of the test cell, not the anode gel of the claimed electrochemical cell, that is to be discharged in accordance with the limitation of claim 1." Energizer Br. 28.

The specification sets forth a detailed test procedure. See '709 patent col.4 l.38–col.5 l.44. The specification states that the procedure is run by preparing a 100-gram "anode mix" using 63 grams of zinc powder. Id. col.4 ll.38–52. Referring to FIG. 1 of the patent, the specification recites that "an anode collector 10 in the form of a disk with a tap 12 is made from 33 ga cartridge brass sheet placed inside a flat bottomed 500 ml polypropylene beaker that is cut off at about the 250 ml level, thus providing a cell cup 1." Id. col.4 ll.45–49. The anode mix is then placed in the "cell cup": "One hundred grams of the anode mix 15 is added into the cup 1 on top of the anode current collector 10." Id. col.4 ll.50–52. Still referring to FIG. 1, the specification continues by stating that "[a] strip of separator paper 19 is placed on the wall of the cup 1 to shield the anode collector tab 12 from the cathode collector 20." Id. col.4 ll.54–56. The specification

explains that "[t]he cathode collector 20 is a piece of 0.011 inch thick Type 'K' zinc sheet, and is cut in a 3 inch disk 22 with a 0.5 inch by 1.5 inch tab 23. The disk 22 contains openings 25 that permit escape of hydrogen gas during discharge." Id. col.4 ll.56–60. Next, referring to FIG. 2 of the patent, the specification describes in detail the procedure for "identifying zinc for cells" of the invention claimed in the patent. Id. col.5 ll.1–48. The specification continues with a description of the kinds of additives that are appropriate for the cells of the invention, id. col.5 l.52–col.6 l.51, and with a discussion of the anode current collector 10, id. col.6 l.52–col.7 l.31. This discussion specifies that "[a] burnished brass anode collector is preferably employed in the cells of this invention." Id. col.6 ll.52–53. Before the claims of the patent, the specification gives two examples of cells that can be used in the described procedure. Id. col.8 l.62–col.10 l.55. The first sentence of Example 1 states that "[s]everal C-size cells are constructed, discharged and stored at different temperatures for different periods." Id. col.8 ll.62–63. For its part, the first sentence of Example 2 states that "[c]ells are prepared in the same manner with the same components as in Example 1, except that no indium hydroxide is added." Id. col.10 ll.16–18.

I have described the specification of the '709 patent at some length to demonstrate why it is clear to me that what is claimed in claim 1 of the '709 patent is not what is described in the patent specification. Claim 1 claims a commercial battery cell in which the anode gel (anode) is "discharged for 161 minutes to 15% depth of discharge at 2.88A," whereas, as Energizer recognizes, the specification describes only a test cell—which is not referenced in the claims—being discharged to that parameter. The specification consistently uses the term "anode gel" to refer to the anode of a <u>test</u>

cell, not to the anode of a completed battery. See id. col.4 l.39 (describing the process of subjecting an anode gel of a test cell to the discharge test), col.8 l.60–col.10 l.15 (providing examples of test cells). Finally, the specification contains no language linking the anode gel of a completed battery, as described in the claims, with the test cell described in the specification.

In a word, at the root of the written description issue in this case lies the fact that the invention of the '709 patent is a test to pre-screen zincs for use in zero-mercury added alkaline batteries to be sold to consumers.[4] As just seen, that is the invention that is described in the patent specification. However, the claims of the '709 patent were drafted to claim commercial alkaline batteries. "Specifications teach. Claims claim." SRI Int'l v. Matsushita Elec. Corp. of Am., 775 F.2d 1107, 1121 n.14 (Fed. Cir. 1985). The problem in this case is that the specification of the '709 patent does not teach what is claimed, whereas the claims of the patent do not claim what is taught. For that reason, the decision of the Commission that the asserted claims of the '709 patent are invalid for failure to meet the written description requirement of 35 U.S.C. § 112, ¶ 1 is neither unsupported by substantial evidence nor tainted by legal error.[5] See Univ. of Rochester, 358 F.3d at 921 (stating that deciding whether the written description requirement is met involves "determining whether the subject matter defined in the claims is described in the specification").

---

[4] Dr. Scarr, an inventor of the subject matter of the '709 patent, testified that "[his] invention was a way of qualifying zinc powder [f]or use in batteries that were to be used in the zero-mercury applications." Scarr Dep. 18.

[5] Since I conclude that claims 1–7 of the '709 patent are invalid for failure to meet the written description requirement, I do not reach the issue of infringement.

## CONCLUSION

For the foregoing reasons, I would affirm the decision of the Commission in Energizer III to terminate its investigation into Intervenors' importation into the United States of zero-mercury-added alkaline batteries.

## AFFIRMED

NOTE:  This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

2007-1197

ENERGIZER HOLDINGS, INC.
and EVEREADY BATTERY COMPANY, INC.,

Appellants,

v.

INTERNATIONAL TRADE COMMISSION,

Appellee,

and

GOLDEN POWER INDUSTRIES, LTD., GUANGDONG CHAOAN ZHENGLONG
ENTERPRISE CO., LTD., GUANGZHOU TIGER HEAD BATTERY GROUP CO., LTD.,
FUJIAN NANPING NAFU BATTERY CO., LTD., HI-WATT BATTERY INDUSTRY
CO., LTD., NINGBO BAOWANG BATTERY CO., LTD., SICHUAN CHANGHONG
ELECTRIC CO., LTD., and ZHONGYIN (NINGBO) BATTERY CO., LTD.,

Intervenors.

On appeal from the United States International Trade Commission in Investigation No.
337-TA-493.

LINN, <u>Circuit Judge</u>, concurring in the result set forth in the opinion filed by Judge
Schall.[1]

While I concur with my colleague, Judge Schall, that claim 1 of the '709 patent is

invalid, I reach that conclusion for a different reason.  Judge Schall agrees with the

---

[1]       In <u>Eastern Enterprises v. Apfel</u>, 524 U.S. 498 (1998), five justices of the
Supreme Court agreed to invalidate portions of the Coal Act, but disagreed as to the
basis for the judgment.  Justice O'Connor filed an opinion, joined by three of her
colleagues, reasoning that the Coal Act violated the Takings Clause of the Fifth
Amendment.  <u>E. Enter.</u>, 524 U.S. at 538.  Justice Kennedy filed an opinion concurring in
the judgment but noting that he would invalidate the Coal Act "without regard to the
Takings Clause."  <u>Id.</u> at 539.  Thus, while a majority supported the result set forth in the
Judgment, there was no "opinion of the Court."  <u>See</u> <u>id.</u> at 503.  The same is true in the
present case.

International Trade Commission's ("Commission's") holding of invalidity based on lack of written description under 35 U.S.C. § 112, ¶ 1. He does so by applying our precedent, which finds in paragraph one of section 112 a separate written description requirement. I have long been critical of that precedent and believe that § 112, ¶ 1 requires no more than an enabling disclosure of the claimed invention. See Univ. of Rochester v. G.D. Searle & Co., Inc., 375 F.3d 1303, 1325–27 (Fed. Cir. 2004) (Linn, J., dissenting from denial of rehearing en banc); Enzo Biochem, Inc. v. Gen-Probe Inc., 323 F.3d 956, 987–89 (Fed. Cir. 2002) (Linn, J., dissenting from denial of rehearing en banc). But I see no need here to revisit that debate because, as I see it, the present case can be—and properly should be—decided on the basis of the patentee's failure to comply with § 112, ¶ 2.

Paragraph two of section 112 states that "[t]he specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." I agree with the determination made on the last appeal that the claim is not indefinite for failure to provide antecedent basis for the phrase "said zinc anode."[2] Following that determination, the Commission on remand was required to decide, inter alia, the scope of the claim and the "subject matter" which the applicant "particularly point[ed] out and distinctly claim[ed] . . . as his

---

[2]     In the last appeal, the court was presented with the narrow question of whether the claim term "said zinc anode" lacked antecedent basis. I do not read our determination that "anode gel" is the antecedent basis for "said zinc anode" as foreclosing any further consideration of § 112, ¶ 2 issues. And even to the extent that opinion could be read more broadly, the law of the case doctrine "merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power." Messinger v. Anderson, 225 U.S. 436, 444 (1912); see also Cent. Soya Co. v. Geo. A. Hormel & Co., 723 F.2d 1573, 1580 (Fed. Cir. 1983) (noting that the law of the case doctrine "is not an inexorable command").

invention." § 112, ¶ 2. And therein lies the problem. A proper construction of the disputed claim is unattainable.

The claim cannot be interpreted to mean a battery cell with an anode gel having 63 grams of zinc, not only because such a construction is inconsistent with present commercial requirements, but more significantly because that would require an anode gel which expands in accordance with the specifications of the test cell configuration and yet acts in concert with a cathode of the type specified in the commercial battery examples. Such an interpretation can hardly be said to reflect what the applicant regarded as his invention. On the other hand, to construe the claim to cover what the applicant seems to have intended—namely, a battery cell with an anode containing zinc of a purity determined by use of the disclosed test cell procedure—would require that we rewrite the claim. That we are not permitted to do. See Allen Eng'g Corp. v. Bartell Indus., Inc., 299 F.3d 1336, 1349 (Fed. Cir. 2002) ("It is not our function to rewrite claims to preserve their validity."); Rhine v. Casio, Inc., 183 F.3d 1342, 1345 (Fed. Cir. 1999) (noting that we have "admonished against judicial rewriting of claims to preserve validity"). We are simply tasked with determining whether the claims "particularly point[ ] out and distinctly claim[ ]" what the inventor regards as his invention. 35 U.S.C. § 112, ¶ 2; see also In re Zletz, 893 F.2d 319, 322 (Fed. Cir. 1989) (holding that claims failing this test during prosecution must be rejected under § 112, ¶ 2). If the applicant desired coverage of a battery with zinc having specified properties, it should have written claim 1 of the '709 patent the way it wrote claim 1 of its related U.S. Patent No. 5,395,714 (reciting, "[a]n electrochemical cell comprising . . . an anode gel comprised of low expansion zinc which has a gel expansion of less than 25% after being discharged for

161 minutes to 15% depth of discharge at 2.88A").  See <u>Hoganas AB v. Dresser Indus., Inc.</u>, 9 F.3d 948, 951 (Fed. Cir. 1993) ("If [the patentee], who was responsible for drafting and prosecuting the patent, intended something different, it could have prevented this result through clearer drafting.").

Because I believe the claim is insolubly ambiguous and, thus, indefinite, I concur that claim 1 of the '709 patent is invalid.  <u>See</u> <u>Exxon Research & Eng'g Co. v. United States</u>, 265 F.3d 1371, 1375 (Fed. Cir. 2001) ("If a claim is insolubly ambiguous, and no narrowing construction can properly be adopted, we have held the claim indefinite.").  In my opinion, claim 1 fails to comply with the second paragraph—not the first paragraph—of § 112.

NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

2007-1197

ENERGIZER HOLDINGS, INC.
and EVEREADY BATTERY COMPANY, INC.,

Appellants,

v.

INTERNATIONAL TRADE COMMISSION,

Appellee.

and

GOLDEN POWER INDUSTRIES, LTD., GUANGDONG CHAOAN ZHENGLONG
ENTERPRISE CO., LTD., GUANGZHOU TIGER HEAD BATTERY GROUP CO., LTD.,
FUJIAN NANPING NAFU BATTERY CO., LTD., HI-WATT BATTERY INDUSTRY
CO., LTD., NINGBO BAOWANG BATTERY CO., LTD., SICHUAN CHANGHONG
ELECTRIC CO., LTD., and ZHONGYIN (NINGBO) BATTERY CO., LTD.,

Intervenors.

Appeal from the United States International Trade Commission in Investigation No. 337-TA-493.

NEWMAN, <u>Circuit Judge</u>, dissenting from the judgment.

My colleagues on this panel hold the Energizer patent invalid, although they do not agree on the grounds, and there is no majority opinion. I write separately to state my concerns with their respective theories. Although it is apparent that the '709 patent's claims are not perfect, it is equally apparent that the invention that is claimed is the invention that

is unambiguously and clearly described in the specification. When there is absolute clarity in the specification, the court fails its responsibility as ministrator of justice, by wiping out a valuable patent on imperfections that confuse no one. The complexities of patent claim writing are notorious. There are few, if any, legal documents more difficult to craft, more fraught with pitfalls than patent applications; and patent claims are so universally challenging to the non-specialist, that this court has converted the judicial need to understand them into an unruly cottage industry called "claim construction." Yet the Energizer patent claims are readily and unambiguously understood when the rest of the specification is read.

Thus I do not agree that the '709 patent does not meet the written description or definiteness requirements. My colleagues reach these conclusions after construing the claims to exclude the invention described in the specification, and on this basis they hold the description in the specification or the wording of the claims defective. Undoubtedly the claims could have been more perfectly drawn, but when read in the context of the specification there is no doubt as to what is described and claimed. See, e.g., Biogen, Inc. v. Berlex Labs., Inc., 318 F.3d 1132, 1140 (Fed. Cir. 2003) ("Any ambiguity, as may be raised when dispute arises, requires the decisionmaker to focus objectively on the patent specification and claims, for the specification is the basic presentation by the applicant, and the claims represent the final product of a sometimes imperfect process."); Multiform Dessicants, Inc. v. Medzam, Ltd., 133 F.3d 1473, 1477 (Fed. Cir. 1998) ("It is the person of ordinary skill in the field of the invention through whose eyes the claims are construed."). All parties, including the Intervenors, agree that a person of ordinary skill in the field of the invention would understand what was invented, described, and claimed, despite less than perfect clarity if the claims are removed from their foundation in the specification.

2007-1197 2

The entire specification is directed to the testing of the zinc anode material for gel expansion under standardized conditions, using 63 grams of zinc in 100 grams of test anode material and measuring the gel expansion when the test anode is discharged for 161 minutes to 15% depth of discharge at 2.88A — these are the parameters included in the claims to characterize the "low expansion" zinc in the claimed electrochemical cells. Included in the patent are drawings of the apparatus in which the sample gel is discharged. The specification unambiguously describes the low expansion zinc anode gels and measurement of their degree of expansion:

> The term "low expansion" is a relative term, and is determined by comparing the amount of expansion of different types of zinc anode gel mixes. Generally, the zinc used to prepare the anode gel that expands the least will provide a lower gassing cell, and, thus, in this invention, "low expansion zinc" means zinc that expands to a lower degree relative to other zincs. The degree of expansion of zinc anode gels can be measured by preparing an anode gel, assembling a cell and discharging the cell. An amount of the gel is then removed from the cell, place in a container and stored. After storing, the amount of expansion is measured and compared to the amount of expansion of undischarged gel that is stored under the same conditions.

'709 patent, col. 4, lines 25-37. Nonetheless, my colleagues on this panel ignore the specification's lengthy exposition of the measurement of the degree of expansion of "different types of zinc anode gel mixes," supra, when discharged under standardized conditions.

The specification teaches that zinc anode gels with low expansion are preferable for use in commercially useful alkaline batteries; it is such battery cells that comprise the claimed subject matter. The "Background of the Invention" explains that the problem of gas formation due to corrosion of the zinc, resulting in gel expansion and leakage, had previously been controlled by including mercury in the anode, but that adverse environmental effects require elimination of the mercury component. Id. col. 1, lines 23-59.

2007-1197                                3

The "Summary of the Invention" states: "The cell comprises an alkaline electrolyte, a cathode and an anode arranged in a sealed container in a manner effective to provide electrochemical energy, wherein the anode is comprised of low expansion zinc as the active anode material," id. col. 2, lines 24-28, and that "[t]he cells do not leak under conditions of normal use and storage, and provide an effective amount of electrochemical energy to be useful as batteries," id. col. 2, lines 36-40.

The "Detailed Description of This Invention" states that zinc is the active anode material, and that "[p]referably, the zinc is low expansion zinc, and is in powder form," and that when combined with a binder, an electrolyte solution, and other optional components to form an anode gel, the gel typically "expands when it is discharged and then stored." Id. col. 4, lines 12-17. The specification then provides a detailed description of a standardized method of determining the expansion of a given anode gel, and the characteristics, using that method, of the desired low expansion zinc, stating the procedure that is used to test batches of zinc powder for use in "the cells of this invention." Id., col. 4, lines 38-39. The specification contains a full "written description" of this measurement procedure, including specific examples of an "anode mix . . . made of 63 weight percent zinc powder, 0.5 weight percent binder (Carbopol™940 is a suitable example), and 36.5 weight percent of aqueous potassium hydroxide electrolyte (37% aqueous solution) that contains 42.5 gm of zinc oxide per liter." Id. col. 4, lines 40-44. In conducting the measurement, 100 grams of this mixture is placed a test cell, shown in patent drawing Figure 1, and discharged, shown in patent drawing Figure 2, "to 15% depth of discharge at 2.88A for 161 minutes." Id. col. 4, line 45 through col. 5, line 3. The test applies external amperage for discharge, and after 161 minutes of discharge the gel expansion is determined:

After the discharge is completed, a portion of the anode mix is measured to

the six millimeter level into four polypropylene graduated cylinders that have a capacity of ten millimeters. The cylinders should contain about 17 grams of anode mix. The same amount of fresh undischarged anode mix should be measured into four other ten millimeter graduated cylinders. About 1 millimeter of low density, high vapor pressure oil, such as pump oil, that is insoluble in and inert to the electrolyte is added on top of the mix in each cylinder. . . . [After storage for 24 hours at 71°C] the specific expansion rate of the mix (SER) is calculated . . . .

'709 Patent, col. 5, lines 12-40. The testing procedure requires not only the discharge of a test anode gel in a test cell, but also storage and comparative measurement of the discharged anode mix.

The specification also describes alkaline batteries prepared using the zinc that meets the test criteria, explaining that some "void volume" is left in an alkaline cell to accommodate whatever amounts of gas may be formed, and that "the cells of this invention have a void volume of 6% to 13% of the cell's internal volume." Id. col. 7, lines 32-36. The specification states, "The cells of this invention, regardless of size, exhibit a degree of bulge less than the amount that will typically cause leakage of the cell components," id. col. 8, lines 33-35, and presents specific test results for C-size cells using zinc that was determined to have a "6.2% SRVER [i.e. relative volume] expansion rate" using the designated measurement procedures, id. col. 8, line 54 through col. 10, line 55. It is clear throughout the specification that the gel expansion rate is determined in advance, in accordance with the specified test cell measurement procedure.

Claim 1 of the '709 patent is as follows:

1. An electrochemical cell comprising an alkaline electrolyte, a cathode comprising manganese dioxide as an active cathode component, and an anode gel comprised of zinc as the active anode component, wherein the cell contains less than 50 parts of mercury per million parts by weight of the cell and said zinc anode has a gel expansion of less than 25% after being discharged for 161 minutes to 15% depth of discharge at 2.88A.

The Commission ruled (by majority vote) that claim 1 requires that every electrochemical

cell covered by the claim has been discharged for 161 minutes to 15% depth of discharge at 2.88A. The Commission held that the cell discharge parameters set forth in the claim are not applied to a test cell, but require that every cell covered by the claim has been discharged for 161 minutes to 15% depth of discharge at 2.88A. The Commission observed that this "invention" is not described in the specification, which describes the discharge of a test cell, and thus the Commission held the claim invalid for lack of written description of what is claimed. My colleague Judge Schall agrees with the Commission, whereas my colleague Judge Linn views the claims as fatally indefinite because they do not claim what is described. Indeed, the claim does not explicitly refer to the test cell. However, it is not difficult to read the claims in accordance with the specification. It is the judicial obligation to preserve property rights when this can reasonably be accomplished, when there is no doubt as to what is patented. All of the parties, including the Intervenors, conceded that they readily understood what had been invented and what is intended to be covered by the claims.

The Commission attributed its holding to this court's ruling on a previous appeal, Energizer Holdings, Inc. v. United States International Trade Commission, 435 F.3d 1366 (Fed. Cir. 2006), where this court reversed the Commission's holding that the claims were invalid for indefiniteness due to the lack of "antecedent basis" for the claim term "said zinc anode." This court held that the claim was not indefinite, explaining that the earlier mention of "anode gel" was an adequate antecedent basis. The court pointed out that the claim-drafting protocol of "antecedent basis" is a technical procedure, that the patent examiner had not objected on this ground, and that no party had argued that the claim was unclear because of the lack of an antecedent basis. Id. at 1370-71.

On remand, the Commission held that this court's "antecedent basis" designation

requires that every claimed cell is discharged for 161 minutes to 15% depth of discharge at 2.88A. The Commission explained that since the specification discusses these parameters only for a test cell, while the claim requires that the anode of every complete electrochemical cell is discharged, the specification's written description is deficient and therefore the claim is invalid on written description grounds. The two Commissioners in dissent stated that they "understand the disputed language of claim 1 to indicate that the anode gel exhibits a certain property ('has a gel expansion of less than 25%') when subjected to specific parameters ('discharged for 161 minutes to 15% depth of discharge at 2.88A')," and that looking at the specification, a person of ordinary skill would understand that the claim describes a "gel expansion" property, which is evaluated by means of the test cell "according to the parameters more fully described in the specification." Comm'n diss. op. at 2-3. The dissenters concluded that this court's designation of an antecedent for "said zinc anode" did not "mandate" the majority's reading of the claim as requiring that every cell is discharged.

My colleagues agree with the Commission majority that the claim language requires discharge of the anode of every claimed cell, rather than a test cell, one colleague then holding that the claims are invalid because the specification does not accord with the claims, and the other colleague holding that the claims are invalid because the claims do not accord with the specification. I repeat, no one is confused as to the invention in the specification, and the parties and intervenors so confirmed. Yet this court simply declines to read the claims in light of the specification.

One can criticize the claims for permitting the absurd reading that was accepted by the Commission and now by my colleagues. However, when the specification is consulted, there is no ambiguity as to what is covered by the claim. "The claims of a patent are

always to be read or interpreted in light of its specifications . . . ." Schriber-Schroth Co. v. Cleveland Trust Co., 311 U.S. 211, 217 (1940); Carnegie Steel Co. v. Cambria Iron Co., 185 U.S. 403, 432 (1902) ("The claim of a patent must always be explained by and read in connection with the specification . . . ."); Phillips v. AWH Corp., 415 F.3d 1303, 1315 (Fed. Cir. 2005) (*en banc*) ("claims must be read in view of the specification, of which they are a part").

When there is an apparent ambiguity in claim language, the court must seek a reasonable interpretation based on the specification, not one that defies the fundamental tenets of the invention. See Rexnord Corp. v. Laitrop Corp., 274 F.3d 1336, 1343 (Fed. Cir. 2001) ("[I]f the term or terms chosen by the patentee so deprive the claim of clarity that there is no means by which the scope of the claim may be ascertained by one of ordinary skill in the art from the language used, a court must look to the specification and file history to define the ambiguous term in the first instance."); K-2 Corp. v. Salomon S.A., 191 F.3d 1356, 1363 (Fed. Cir. 1999) (same). "[I]t is necessary to consider the specification as a whole, and to read all portions of the written description, if possible, in a manner that renders the claim internally consistent," Budde v. Harley-Davidson, Inc., 250 F.3d 1369, 1379-80 (Fed. Cir. 2001), as well as to reflect the purpose of the invention, Apple Computer, Inc. v. Articulate Systems, Inc., 234 F.3d 14, 25 (Fed. Cir. 2000). As the court recognized in Autogiro Co. v. United States, 384 F.2d 391 (Ct. Cl. 1967), the determination of whether a claim is ambiguous or clear cannot be ascertained without reference to the specification and prosecution documents:

> Claims cannot be clear and unambiguous on their face. A comparison must exist. The lucidity of a claim is determined in light of what ideas it is trying to convey. Only by knowing the idea, can one decide how much shadow encumbers the reality. . . .

****

> . . . Thus we find that a claim cannot be interpreted without going beyond the claim itself. No matter how clear a claim appears to be, lurking in the background are documents that may completely disrupt initial views on its meaning.
>
> ****
>
> In deriving the meaning of a claim, we inspect all useful documents and reach what Justice Holmes called the "felt meaning" of the claim.

Id. at 396-97 (footnotes omitted). Precedent is extensive, and powerful, that any uncertainty flowing from the drafting of the claim seeks resolution by recourse to the specification, as understood by persons of ordinary skill in the field of the invention. See Carnegie Steel, 185 U.S. at 437 ("The specification of the patent is not addressed to lawyers, or even to the public generally, but to the manufacturers of steel . . . .").

Where, as here, it was agreed that a person of ordinary skill in the field of the invention would understand that the specification describes and the claims state the parameters of the test for gel expansion, and do not require every battery cell to be discharged before it is sold, the proper claim construction must reflect that undisputed understanding. There is no warrant for the Commission and my colleagues to adopt an unsupportable view of the claims, and then invalidate the claims because that view is not supported.

The specification shows that the discharge time and conditions and gel expansion parameters are for the test cell. No lack of clarity in the specification has been suggested. The specification's description of 63 grams of zinc in a 100-gram test anode gel, the 161 minute discharge to 15% depth, the application of an external current of 2.88A, and the incubation of the discharged mix along with control samples in graduated cylinders for 24 hours at 71°C, cannot be understood as required for every claimed electrochemical cell that is manufactured for sale in commerce. The patent examiner did not require clarification, and all parties agreed that the parameters in the claim apply to the test cell. The

Commission so stated:

> The specification consistently refers to the anode gel in its entirety as being the anode of the cell. The so-called "low expansion" zinc used in the anode gel is selected from available zinc powders by using a test to measure what the specification refers to as the "specific expansion rate" ("SER") and/or "relative volume expansion rate" ("SRVER") of a test anode gel mix made from 63 grams of the zinc powder being screened. The test employs a special electrochemical test cell and apparatus described in the specification. Zinc powders used in test anode gel mixes that pass the test, referred to as "low expansion" zincs, may then be used with other components to make the anode gels of the alkaline cells.

Comm'n op. at 2-3 (footnote omitted). Nonetheless, the Commission held claim 1 fatally defective because it did not explicitly reference the test cell, ruling that "this test cell is not the 'electrochemical cell' of the claims nor is it referred to elsewhere in the claims." Id. at 16. The Commission stated that "[t]he specification does not associate the discharge language with the 'electrochemical cell' of the claims or with the anode gel (anode) of that cell," id. at 14, ruling that since the specification did not describe the Commissioner's incorrect claim construction the specification was totally defective on written description grounds.

The question is whether Energizer's claims in the '709 patent should be construed in accordance with their undisputed intended meaning, as clearly described in the specification and accepted by the patent examiner, or whether this patentee must be punished for a "disconnect" or "ambiguity" that has no relation to what was invented. This court rejected a similar finding of invalidity in C.R. Bard, Inc. v. M3 Systems, Inc., 157 F.3d 1340, 1360 (Fed Cir. 1993), stating:

> Bard states that it is incorrect to construe the claims contrary to the specification, and then to hold the claims invalid because they are contrary to the specification. Bard is of course correct; the claims are construed in accordance with the rest of the specification of which they are a part, and not contrary to it.

2007-1197                                    10

This principle invokes the standard rules of claim construction, as in Hoechst Celanese Corp. v. B.P. Chemicals, Inc., 78 F.3d 1575, 1581 (Fed. Cir. 1996) ("it is unlikely that an inventor would define the invention in a way that excluded the preferred embodiment, or that persons of skill in the field would read the specification in such a way"). The appropriate analytic procedure is as set forth in Phillips, where the court reiterated that the primary source for understanding and thus construing a claim is the specification, and that "[t]he construction that . . . most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." 415 F.3d at 1315-16.

Contrary to Judge Schall's assertions, see Concurring in the Judgment op. (Schall, J.) at 2, nothing in this court's earlier ruling on "antecedent basis" forecloses an interpretation of the full claim language that comports with the invention described in the specification. The designation of "anode gel" as the implicit antecedent for "said zinc anode" does not affect the meaning of "has a gel expansion of less than 25% after being discharged for 161 minutes to 15% depth of discharge at 2.88A." This court has reiterated that "the patentee's mere use of a term with an antecedent does not require that both terms have the same meaning," Microprocessor Enhancement Corp. v. Texas Instruments Inc., ___ F.3d ___, 2008 WL 850332, at *7 (Fed. Cir. Apr. 1, 2008), especially when such construction would result in a "nonsensical reading" of the claim. Id. at *8 ("Indeed, the claims' apparent nonsensical reading under a uniform construction of "condition code" is indicative of the ease of determining the appropriate meaning of each use of the term from its context.").

Judge Linn does recognize that this court's earlier "antecedent basis" decision did not decide all remaining issues, see Concurring in the Judgment op. (Linn, J.) at 2 n.2, yet he concludes that the "nonsensical" construction adopted by Judge Schall and the

Commission majority is the only one that the claim language will bear without forbidden "rewriting." However, no rewriting of the claim is necessary to construe the claim's gel expansion criterion as determined by a test procedure, for the claimed parameters "for 161 minutes to 15% depth of discharge at 2.88A" are the test cell parameters described in the specification. Our role is not to criticize the claim language that was accepted by the examiner, as do my colleagues; our role is judicially to construe the claims as a person of skill in the field of the invention would understand them. Such construction is available in this case.

The Intervenors make much of what they call Energizer's "admitted claim drafting errors." However, it was conceded that the claims would be understood, by a person of ordinary skill, as stating test parameters, not as requiring that every battery is discharged. That is what the specification unambiguously describes. From my colleagues' holding of invalidity, on the ground of either written description or indefiniteness, I respectfully dissent.